Robert SMART, Plaintiff/Appellant,

v.

CHRYSLER CORPORATION, Defendant/Respondent.

No. 74940.

Missouri Court of Appeals, Eastern District, Division Five.

May 18, 1999.

Matthew B. Woods, Thad R. Mulholland, Columbia, for appellant.

James S. Kreamer, Kansas City, for respondent.

ROBERT E. CRIST, Senior Judge.

Plaintiff, Robert Smart, brought a negligence action against the defendant, Chrysler Corporation, for injuries he sustained while working as an employee of Helmkamp Construction, a sub-contractor for independent contractors ABB Flexible Automation and Fluor Daniel, which were doing work at one of Chrysler's plants in Fenton, Missouri. Smart now appeals the trial court's judgment granting Chrysler's motion for summary judgment. We affirm.

Chrysler owns two plants in Fenton, the South Plant and the North Plant, where it has assembled various automobiles. The South Plant was opened in 1959 and produced automobiles until 1991. In that year, the South Plant was gutted and vacated, and remained vacant for about two years. While the South Plant was vacant, Chrysler made a decision to retool it to produce a new line of mini-vans that was being designed. The retooling project was labeled the Chrysler NS Project. Chrysler sent out bid specifications to many contractors for the different aspects of the NS project and received bids from them. ABB and Fluor Daniel (ABB/FD) joined together in a joint venture and submitted a comprehensive proposal and bid to Chrysler for the paint shop portion of the retooling project.

In December of 1992, Chrysler awarded a contract to ABB/FD to design, fabricate and install paint application equipment in the South Plant. Design of the new equipment began soon thereafter and sometime in December 1993 construction began in the South Plant. At the time the retooling work began, the South Plant still stood vacant and no production activities were ongoing by Chrysler employees.

In June of 1994, ABB/FD was installing the paint shop on the second floor of the South Plant. ABB/FD hired a subcontractor, Helmkamp Construction, to assist with the erection of steel structures. Smart worked for Helmkamp. On June 12, 1994, Smart was working on the construction of a platform in the paint shop area, setting checkerplate flooring on the steel platform. While attempting to dislodge an apparatus used to set the checkerplate in place, Smart fell about 40 feet to the floor below and sustained injuries. At the time he fell, he was wearing a safety harness, but it was not tied off at any point. Generally, when working over six feet, a full body harness must be used and it must be tied off.

On August 20, 1997, Smart filed a petition against Chrysler, alleging premises liability of Chrysler as follows:

9. That during the period of construction and/or repair, Chrysler had set forth safety guidelines and stationed safety personnel throughout the construction site, and as such, maintained substantial control over the premises, or in the alternative, had assumed the primary duty of maintaining a safe work environment.

10. That Defendant Chrysler had instructed its safety personnel in the safety procedures and guidelines to be implemented at Fenton Plant # 2.

11. That Defendant Chrysler mandated that the safety personnel ensure that these procedures and guidelines were followed by the construction personnel at the Fenton Plant # 2 location.

12. That Defendant Chrysler knew of the dangers posed by the construction of the premises or by the use or exercise of reasonable care would have discovered the dangers posed by the construction of the premises and the Defendant should have realized that the premises involved an unreasonable risk of harm to Smart and others similarly invited to work at the construction site.

13. That the Defendant Chrysler should have expected that Plaintiff Robert Smart and others similarly situated would not discover the presence of the dangers posed by the construction or would not realize the dangers presented by said construction or would not protect themselves against the dangers posed by the construction of the premises.

On April 13, 1998, Chrysler filed a motion for summary judgment arguing that Chrysler owed no duty to Smart and particularly did not owe a duty to him to inspect for safety violations. Chrysler attached to its motion the affidavits of: (1) Deborah Lowis, Standard Products Manager for ABB Flexible Automation; (2) Wayne Goodbred, Safety Manager for ABB/FD in 1993 and 1994; and (3) Richard D. Noah, Chrysler's Facility Manager of the South Plant. Chrysler also attached a copy of "Project Safety Rules" and Smart's accident statement.

Following Chrysler's motion, the parties conducted many depositions. On July 6, 1998, Smart filed a response to Chrysler's motion for summary judgment. Smart attached depositions of Wayne Goodbred, Deborah Lowis and Brian Belanger, a construction services buyer for Chrysler. He also attached his affidavit, the "Project Safety Rules" and the "NS Chrysler Project Team Project Rules and Regulations." Part of Smart's contentions in his response was that no complete copy of the contract between Chrysler and ABB/FD had been forthcoming from Chrysler.

On July 17, 1998, Chrysler filed a reply to Smart's response. Chrysler argued that Smart still had not established the requisite control by Chrysler to maintain its claim and that numerous Missouri decisions dictated summary judgment. Chrysler included in its motion the depositions of George Patterson, head of the Safety Department for Chrysler, and Bob Buhr, the program manager for the Chrysler NS project. These depositions were taken on May 12, 1998, before Smart filed his response to Chrysler's summary judgment motion. Chrysler also included a copy of the bid specifications it had sent to contractors for the paint shop retooling and a copy of the proposal sent by ABB/FD to Chrysler. An affidavit from Brian Belanger indicated the ABB/FD proposal had just been located by him in storage.

On July 24, 1998, the trial court granted Chrysler's motion for summary judgment. Smart appeals, arguing in Point I the trial court erred in granting summary judgment because genuine disputes of material fact exist and further arguing the trial court should have stricken the affidavits contained in Chrysler's motion for summary judgment. In Point II, Smart contends the trial court should not have con-

sidered Chrysler's reply to his response because he was not given ample time to examine and prepare responses to "certain documents" which were not produced by Chrysler prior to that time.

■ Since Point II goes to what information the trial court should have examined in granting summary judgment, we will consider it first. Smart's major complaint is that Chrysler included a copy of the "contract" between ABB/FD and Chrysler in its reply and not in its original motion. In referring to the "contract," Smart appears to mean the proposal from ABB/FD to Chrysler. Smart apparently has no contention with the Chrysler bid specifications and the depositions of George Patterson and Bob Buhr (conducted by Smart prior to the filing of his response), but focuses his complaint on appeal to the proposal from ABB/FD. The parties agree that at the time Chrysler filed its motion for summary judgment, Chrysler was unable to locate a copy of this proposal.

Rule 74.04 sets forth the procedure for motions for summary judgment. This rule does not explicitly provide for nor prohibit reply briefs. However, subsection (e) provides that the "court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." In *Palermo v. Tension Envelope Corp.*, 959 S.W.2d 825, 827 (Mo. App. E.D.1997), this Court found that to the extent a reply "supplemented or opposed affidavits offered by [plaintiff] and did not raise new arguments", the trial court could consider the reply. However, the Court disregarded any new material raised in the reply memorandum. *Id.; See also, Carondelet Sav. & Loan Ass'n v. Boyer*, 595 S.W.2d 744, 746 (Mo.App. E.D. 1980) (document attached to reply to response to motion for summary judgment could properly be considered).

Therefore, Chrysler could properly file a reply and include in that reply documents that simply supplement or oppose Smart's response and do not raise any new arguments. Here, the actual written proposal submitted by ABB/FD did not provide any new information or present any new arguments. Several people, including Deborah Lowis from ABB and Brian Belanger from Chrysler, had already provided testimony or affidavits that set out the provisions of the proposal. Once the actual proposal was located by Chrysler, it was filed in the reply.

Smart argues he was prejudiced because he was unable to adequately review the proposal prior to argument on the motion for summary judgment. Rule 74.04(c)(2) states that: "If the party opposing a motion for summary judgment has not had sufficient time to conduct discovery on the issues to be decided in the motion for summary judgment, such party shall file an affidavit describing the additional discovery needed in order to respond to the motion for summary judgment and the efforts previously made to obtain such discovery." We find no evidence of a request or an affidavit. Smart has not filed a copy of the transcript of the arguments on the motions for summary judgment, if one exists. He did send a letter to the court after the arguments, but only requested the court refuse to consider the proposal. He did not specifically request additional discovery nor file an affidavit. In his appellate brief, Smart points to no additional discovery he needed to respond to any "new" issues raised by Chrysler in its reply. Further, Smart fails to point specifically to anything in the proposal which he alleges raises new arguments. In addition, we note Chrysler's response was received at the office of Smart's attorney four days before the summary judgment hearing. Chrysler filed the proposal as soon as it was located and Smart alleges no impropriety by Chrysler's actions. Accordingly, we find no abuse of discretion, assuming the trial court even considered the actual written proposal filed by Chrysler in its reply brief. Point denied.

Turning to the crux of the appeal, we examine Smart's first point on appeal.

Smart argues Chrysler was not entitled to summary judgment because genuine issues of material fact existed. The standard of appellate review on appeal of a summary judgment is essentially *de novo* and the propriety of summary judgment is a matter of law. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). However, we review the record in the light most favorable to the party against whom judgment was entered and accord the non-movant the benefit of all reasonable inferences from the record. *Id.* Summary judgment is permissible where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 74.04(c)(3); *Rice v. Hodapp*, 919 S.W.2d 240, 243 (Mo. banc 1996). "Genuine" implies the issue is real and substantial, not merely conjecture, theory and possibilities. *Id.*.

■ First, Smart argues that the trial court should have disregarded the affidavits of Wayne Goodbred, Richard Noah and Deborah Lowis. He contends that their statements that Chrysler was not responsible for safety were inappropriate legal conclusions and their affidavits do not include any factual support for their conclusions. He also argues at length in his point that the affidavits are contradictory to their deposition testimony and were without foundation. We disagree with his assertions.

Rule 74.04(e) states that "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *See also, Jennings v. City of Kansas City*, 812 S.W.2d 724, 732 (Mo.App. W.D.1991).

■ Here, each affidavit averred it was based on personal knowledge. Further, these three affiants were certainly qualified to state they believed Chrysler was not responsible for safety. Wayne Goodbred was ABB/FD's safety manager and responsible for the daily safety at the jobsite. Richard Noah was the facility engineering manager for Chrysler and was responsible for overseeing the progress of the work. Deborah Lowis worked for ABB/FD as administrative manager for installation of the paint shop at the South Plant. Certainly, all three of these people were well qualified to assert that in their opinion, Chrysler had no responsibility for safety. Furthermore, based on their positions with Chrysler and ABB/FD, they had responsibility for implementing the contract, and therefore, they certainly had an adequate foundation for making such a statement. Furthermore, contrary to Smart's assertions, this is not a legal conclusion but is simply an assertion of fact.

■ In addition, even if this statement were a legal conclusion, this would not require the court to strike the entire affidavit. Instead, the court may look to the remaining portion of the affidavits as well as the multiple depositions and documents to determine if there is a basis to support summary judgment. *Jones v. Landmark Leasing, Ltd.*, 957 S.W.2d 369, 376 (Mo. App. E.D.1997); *Missouri Intergovernmental Risk Management Ass'n v. Gallagher Bassett Services, Inc.*, 854 S.W.2d 565, 569 (Mo.App. E.D.1993). Finally, we have reviewed the affidavits and the deposition testimony of all three affiants and find they are not contradictory as to any material facts.

■ In his petition, Smart sought recovery from Chrysler for premises liability, alleging that Chrysler maintained substantial control over the construction by setting forth safety guidelines and stationing safety personnel throughout the construction site or that Chrysler had assumed the primary duty of maintaining a safe work environment. As a result, Smart argues Chrysler owed him a duty to ensure the work was performed safely.

A property owner owes an invitee the duty to use reasonable and ordinary care to prevent injury to the invitee. *Owens v. Shop 'N Save Warehouse Foods, Inc.*, 866 S.W.2d 132, 134 (Mo. banc 1993). An employee of an independent contractor who has permission to use a landowner's premises is such an invitee. *Id.* However, an exception to this rule is created when the landowner relinquishes possession and control of the premises to an independent contractor during a period of construction. *Matteuzzi v. Columbus Partnership, L.P.*, 866 S.W.2d 128, 132 (Mo. banc 1993). Under these circumstances, the independent contractor, not the landowner, is the possessor of the land and the duty to use reasonable and ordinary care to prevent injury shifts to the independent contractor. *Id.*

However, the duty will not shift to the independent contractor if the landowner controls either the physical activities of the employees of the independent contractor or the details of the manner in which the work is done. *Id.; Halmick v. SBC Corporate Services, Inc.*, 832 S.W.2d 925, 927 (Mo.App. E.D.1992). The landowner's involvement in overseeing the construction must be substantial to justify imposing liability. *Matteuzzi*, 866 S.W.2d at 132. Furthermore, control must go beyond securing compliance with the contracts. *Callahan v. Alumax Foils, Inc.*, 973 S.W.2d 488, 491 (Mo.App. E.D.1998). "The right to insure proper performance of a contract is insufficient in itself to justify the imposition of such liability." *Halmick*, 832 S.W.2d at 928. *See also,* James A. Burt, *Landowner Liability to Employees of Independent Contractors: A Graphic Restatement*, 53 J. Mo. Bar 86 (1997).

We have reviewed the voluminous materials presented to the motion court. Even viewed in the light most favorable to Smart, giving his position every reasonable inference, there is insufficient evidence to show Chrysler controlled either the physical activities of the employees of ABB/FD and its sub-contractors or the details of the manner in which the work was done. A detailed synopsis of the affidavits, testimony and documents is necessary as this issue is fact specific. The supporting and opposing documents were as follows:

(1) *Wayne Goodbred Affidavit:* He attested to the following: (1) as safety manager for ABB/FD, he was responsible for implementing and administering a safety program for the work in the paint shop; (2) Chrysler had no responsibility for implementing or administering the safety programs; (3) with the exception of a skeleton maintenance crew, no Chrysler personnel were at the South Plant; (4) no Chrysler official or employee was responsible for or participated in running safety orientation meetings, weekly safety meetings or safety inspections; and (5) Chrysler was not responsible for and did not control the day-to-day activities or work of the various contractors.

(2) *Wayne Goodbred testimony:* Chrysler did submit some safety rules to be added to their safety orientation for the project, but most of those rules related to an operating plant and did not apply to the vacant plant. He stated that the applicable rules concerned the fire permit system because there were utilities in the South Plant, the rules regarding helicopter lifts and speed limits. The contractors had a pre-project safety meeting and at least one Chrysler representative appeared. Richard Noah, facilities engineering manager for Chrysler, had an office at the South Plant. During his 14 months as safety manager, no one from Chrysler ever came in to inspect or monitor the work. Noah never went on any inspections with him. No Chrysler representative ever inspected for safety violations to his knowledge. He conducted weekly safety meetings with the contractors and no Chrysler representatives attended those meetings. He also had weekly safety meetings with the union personnel on the safety committee and no Chrysler representative ever attended those meetings. He concluded that Chrys-

ler was not responsible for implementing or administering safety because they were never involved in the site inspections or any aspect of safety at the construction site.

(3) *Richard Noah affidavit:* He worked as the facility engineering manager at the South Plant. In his affidavit, he averred, among other things, that: (1) ABB/FD was responsible for overseeing all construction relating to the paint shop, including implementing a safety program; (2) Chrysler's contract with ABB/FD provided that ABB/FD was responsible for safety related issues; (3) Chrysler did not perform any of the retooling work; (4) Chrysler did not participate in the implementation or administration of safety programs and did not run any of the safety meetings or site safety inspections; (5) the individual contractors determined the means and methods of performing the work and Chrysler did not dictate the means or methods; (6) Chrysler did not control the work performed by the contractors; and (7) Chrysler had no responsibility for implementing or enforcing ABB/FD's safety program or any safety programs.

(4) *Richard Noah testimony:* His job as facility engineering manager at the South Plant was to review the engineering and equipment to be installed in the plant, to track progress of the construction regarding installation and cost of the equipment and to manage the budget. There was no safety office in the South Plant, but George Patterson of Chrysler was responsible for reviewing the new equipment and verifying it met safety requirements for Chrysler employees. There were some minimal maintenance employees of Chrysler who were at the South Plant, but they did not participate in, nor have any responsibilities for, the retooling. ABB/FD had construction managers who oversaw all the construction. Chrysler did not have responsibility for overseeing the construction work and only reviewed the progress of the construction and payment. Part of ABB/FD's duties was to oversee

safety requirements—Noah based this conclusion on the bid specifications sent out by Chrysler. Chrysler did control access to the property, but the contractors had control over their work areas.

(5) *Deborah Lowis affidavit:* She was administrative manager for ABB during the installation of the paint shop in the South Plant. Among other things, she attested that: (1) Chrysler did not perform any of the retooling work in the paint shop; (2) with the exception of a skeleton maintenance crew of 5 to 10 people, there were no Chrysler workers at the South Plant; (3) each of the contractors were required to submit a safety plan to ABB/FD and were contractually required to comply with the safety rules and regulations implemented by ABB/FD; (4) as part of its contract with Chrysler, ABB/FD supplied a full-time safety manager, Wayne Goodbred, whose job was to implement and oversee safety policies and regulations; (5) Goodbred conducted the safety inspections of the ongoing work at the plant and held weekly safety meetings; and (6) it was ABB/FD's responsibility to oversee work on the project, including safety issues and the means and methods of performing the work was left up to the individual contractors.

(6) *Deborah Lowis testimony:* As administrative manager for ABB during the installation of the paint shop at the South Plant, she was in charge of scheduling, cost control, budgets and contracts. She had authority to negotiate contracts with Chrysler, but did not negotiate the South Plant contract. She did recognize the contract, however, and indicated that it was her understanding that ABB/FD was to assign on-site staff to monitor safety. She did attend monthly management tours with Chrysler representatives who would tour the construction site and review the progress of the work. She formulated Wayne Goodbred's job responsibilities and testified that Chrysler had no responsibility to oversee safety because they did not have the available personnel with the time

or expertise to oversee the day-to-day work.

(7) *Testimony of George Patterson:* At the time of Smart's accident, he was head of the Safety Department for Chrysler's North Plant. His duties included implementing safety programs for Chrysler employees. His office was located in the North Plant. When the Chrysler NS project started, his workload increased because he had to travel to Detroit weekly to review all the equipment going into the South Plant during the retooling. He had to test the equipment to make sure it met all the safety requirements so that when the plant became operational, Chrysler employees would be able to work safely. His involvement in implementing safety for the contractors at the South Plant was limited to a pre-project meeting with the contractors to ensure that they understood they had total responsibility for safety of their employees. The contractors had that responsibility because Chrysler did not have the manpower nor the expertise to monitor safety during the retooling of the South Plant. He did give all the contractors a copy of the UAW Chrysler Corporate Safety Book, because it contained OSHA standards. The contractors were expected to incorporate those rules into their overall safety program. His job was not to ensure that safety rules complied with by the contractors on the job, but rather, he made sure the equipment to be used by Chrysler employees was designed safely. He had no control over the contractors' safety requirements.

(8) *Bob Buhr testimony:* He was the Program Manager of the Chrysler NS Project. During his tenure, he had weekly update meetings with the contractors for updates on work progress. He stated that Chrysler did not participate in the construction and the contractors did all the work and simply reported back to Chrysler weekly. Chrysler had no people assigned to safety in the South Plant during the retooling and he never went out to see if ABB/FD was enforcing its safety rules.

(9) *Brian Belanger testimony:* He worked for Chrysler as a buyer of construction services and issued the 12/1/92 purchase order to ABB/FD for the paint shop retooling. He was also responsible for negotiation of the contract. He stated that under the contract, ABB/FD was responsible for safety in the paint shop as stated in the bid specifications.

(10) *Bid Specifications and ABB/FD Proposal:* The bid specifications sent out by Chrysler required any bid to include the assignment of "on-site staff to perform the following functions: monitor and field check overall installation for engineering, safety, labor relations, and compliance with all applicable codes, regulations, and specifications." ABB/FD's proposal to Chrysler included the provision of safety engineering duties for the project. The proposal specifically stated that its management would establish and enforce an effective safety program. It outlined its requirements of safety meetings, incentive programs, disciplinary procedure and the like. The proposal specifically stated that "ABB/FD will develop a construction management safety program format for use on the St. Louis project. It will be established and administered in accordance with the requirements contained in the Fluor Daniel Accident Prevention Standards Manual and Environmental Affairs Manual. It will also incorporate applicable federal and state regulations as well as any of Chrysler's specific safety requirements. Our project management will be responsible for administering the safety program, which includes fire protection, accident prevention procedures, and emergency medical care."

We have examined several recent appellate decisions where the courts of this State have entered a summary judgment or directed verdict in favor of landowners and against employees of independent contractors in factually similar cases. In each case, the appellate courts have affirmed these judgments, finding that the plaintiffs were unable to satisfy their burden of es-

tablishing landowners controlled the jobsite or exerted substantial control over the employee's activities or methods of constructions. *See, Owens,* 866 S.W.2d at 132; *Matteuzzi,* 866 S.W.2d at 128; *Callahan,* 973 S.W.2d at 488; *Schumacher v. Barker,* 948 S.W.2d 166 (Mo.App. E.D.1997); *Noble v. Bartin,* 908 S.W.2d 390 (Mo.App. E.D.1995); *Halmick,* 832 S.W.2d at 925.

If under the facts of these cases, the plaintiff could not meet his burden, then Smart falls short. In the instant case, Chrysler did not retain possession of the South Plant while the construction was ongoing. Further, Chrysler did not exercise such substantial control over the details of the construction work so as to justify imposing liability for Smart's injuries. Indeed, the evidence, viewed in the light most favorable to Smart, unequivocally shows that Chrysler relinquished possession of the South Plant to its contractors for the construction, turned over the details of the manner and method of the actual construction of the paint shop to ABB/FD, visited the construction site only to ensure compliance with the contract specifications and never dictated the details of the operation. Chrysler was never in possession or control of the premises. Its activities necessary to secure compliance with the contract are insufficient to impose liability. *Halmick,* 832 S.W.2d at 929.

Furthermore, Chrysler's limited safety activities are insufficient to establish the kind of evidence needed to show liability and hardly amount to an assumption of a duty to ensure a safe working environment for Smart. In *Werdehausen v. Union Electric Co.,* 801 S.W.2d 358, 364 (Mo.App. E.D.1990), this Court discussed the degree of control necessary to subject a landowner to liability for said retained control. In that case, Union Electric had hired an independent contractor to perform construction work at one of its plants. Plaintiff worked for the independent contractor and was injured on the jobsite. In his suit, plaintiff had alleged that Union Electric retained the authority to stop any work operation of the independent contractor which failed to comply with federal safety regulations. We held this was insufficient to show Union Electric had retained control sufficient to subject it to liability. *Id.* The Court recognized that where an employer retains only standard provisions regarding safety inspections, but assumed no affirmative duty regarding safety and never directed the method of performance, there is insufficient control. *Id.* The Court concluded that the mere right to stop work from being done in an unsafe manner is also insufficient to impose liability. *Id.*

In finding Union Electric did not control the details of the independent contractor's work, the court relied upon the fact that Union Electric did not have the knowledge or expertise to distinguish between safe and unsafe methods of construction work, Union Electric hired the independent contractor and made it responsible for the safe performance of its work and the contractor remained free to choose any safe method of performing its work. *Id.* Therefore, there was insufficient control by Union Electric.

We find very little to distinguish the case at hand from *Werdehausen. See also, Horner v. Hammons,* 916 S.W.2d 810, 814–15 (Mo.App. W.D.1995). As outlined above, Chrysler did not control the details of the construction work. Chrysler admittedly did not have the personnel or expertise to handle safety at the construction site. Therefore, it hired ABB/FD and made it responsible for safety. ABB/FD was free to choose any safe method to perform the work.

Smart points to a document labeled "NS Chrysler Project Team Project Rules and Regulations" signed by a Chrysler representative and ABB/FD. Smart argues this document shows Chrysler was an active participant in the administration and implementation of safety rules and regulations at the South Plant. We disagree. The majority of these rules pertain to gen-

eral "housekeeping" rules, such as parking facilities, access to the plant, lunch and bathroom facilities, coffee, etc. Only one rule regards safety and requires employees to follow Chrysler's safety rules and those of the contractor. According to the testimony, this document was simply an information sheet provided to all construction workers at a pre-project orientation meeting. This evidence falls far short of that needed to show such substantial control over the details of the construction work or its performance so as to justify imposing liability on Chrysler for Smart's injuries.

Smart also argues that his affidavit alone creates a factual dispute sufficient to prevent summary judgment. In his affidavit, Smart averred that Chrysler had control over the job site because: (1) Chrysler employees assisted him after his injury; (2) a week before Smart's injury Chrysler evacuated all employees in the plant for a helicopter bringing in structural steel framing; (3) Chrysler had firefighters on hand to ensure no fires caused while using flammable materials; (4) Chrysler placed guards at the plant entrances; (5) Chrysler engineers and personnel drew up the plans and procedures used to retool the facility; and (6) Chrysler signed an agreement specifying that employees would have fall protection.

We disagree. Even assuming all of these allegations are true and accurate, they would be insufficient as a matter of law to show Chrysler had substantial control over the work site. *See, Callahan,* 973 S.W.2d at 491; *Schumacher,* 948 S.W.2d at 170; *Werdehausen,* 801 S.W.2d at 365–66. Furthermore, they are insufficient as a matter of law to show Chrysler assumed a duty of providing a safe work environment to Smart.

Finally, Smart argues that a letter dated 10/8/93 from ABB/FD to Richard Noah of Chrysler creates a factual dispute. Smart states that Noah testified that this letter constituted a subsequent agreement concerning safety between Chrysler and ABB/ FD, while Lowis denied the proposal in the letter was ever accepted by Chrysler. However, this does not create a genuine issue of material fact. Even if the 10/8/93 letter did become part of the agreement, as explained by Lowis it provided for ABB/FD to provide *overall* site safety management for all contractors as opposed to its original agreement to only provide its own safety management for itself and its sub-contractors. If this is true, then it further solidifies Chrysler's position and refutes Smart's allegations. Smart offered no evidence to the contrary.

We find the trial court did not err in granting summary judgment in favor of Chrysler. No genuine issue of material fact remained in the case and Chrysler was entitled to judgment as a matter of law. Point denied.

Judgment affirmed.

ROBERT G. DOWD, Jr., C.J., and KENT E. KAROHL, J., concur.